WIENER, Circuit Judge,
joined by POLITZ, BENAVIDES, CARL E. STEWART, ROBERT M. PARKER, and DENNIS, Circuit Judges, concurring in part and dissenting in part:
Even though I agree with a majority of the fifteen judges comprising this en banc court[1] that (1) the Does have standing to bring their claims, (2) the district court improvidently granted summary judgment to the Beaumont Independent School District (sometimes “BISD” or “the School District”), and (3) the ultimate question in this appeal is whether Clergy in Schools (sometimes “the Program”) is neutral toward religion, I am constrained to write separately for two principal reasons: First, because, like the five other judges who join me to form today’s six-judge plurality,[2] I am convinced that the record in *483 this appeal is more than sufficient to support a summary judgment that the Program is unconstitutional; and second, because a tiny minority of three out of fifteen judges (“the Controlling Minority”[3]) has managed to consign this three-year-old appeal to jurisprudential limbo (if not purgatory) by remanding it to the district court, even though the remaining twelve judges stand ready to dispose of the case, one way or the other, on the existing record.
The “silver lining” of this otherwise clouded result is that nine of fifteen judges now agree that, when reduced to its essentials, this case turns on a single substantive issue: Does a government decision-maker violate the Establishment Clause by using status as a clergyman as the sole criterion for recruiting participants to staff and run a government-created public school program, i.e., when the one and only selection criterion is patently not neutral toward religion? Both now and on remand, when applied to the challenged Program, this one question encapsulates the entire Establishment Clause analysis in this case, primarily the assessment of the Program’s neutrality toward religion, but also its endorsement effect and its compliance with each of the three disjunctive prongs of Lemon.[4] So, even though nine of the fifteen judges who considered the en banc rehearing are in full agreement that the case turns on that question, and twelve of the fifteen judges are ready to answer it, one way or the other, based on the summary judgment evidence before us today, this case is being remanded — a quintessential example of the tail wagging the dog.
As for the nine of us who agree that this case turns on whether Clergy in Schools is neutral toward religion, the three judges comprising the Controlling Minority part company with the remaining six of us when it comes to the frame of reference within which to test the constitutionality of the Program. The Controlling Minority constructs a huge — and, in my view, vastly overbroad — framework: the School District’s entire School Volunteer Program, which the record amply shows to be no more than a hodgepodge of disparate activities furnished to BISD by pre-existing, external organizations — not a cohesive, coordinated group of programs created or assembled by BISD — with one exception: Clergy in Schools, the only volunteer program created “from scratch” by BISD. More importantly, it is the only volunteer program that, from the very beginning, has been staffed by “volunteers” actively recruited by BISD; and, most importantly, BISD has used religious ordination as the sole litmus test for recruiting these volunteers. In addition, the Controlling Minority has subtly substituted the Equal Protection Clause for the Establishment Clause, impermissibly framing the ultimate issue in terms of “equality of treatment” rather than the neutrality that the Constitution demands.[5] This simply cannot be squared with the position taken in June 2000 by five Justices of the Supreme Court who agreed in Mitchell v. Helms that “our most recent use of ‘neutrality’ to refer to generality or evenhandedness of distribution ... is not alone sufficient to qualify [government] aid as constitutional.”[6]
The Program’s exclusionary recruitment criterion and its facial lack of neutrality have convinced the six-judge plurality for *484 whom I write today to choose a much narrower framework than that confected and applied by the Controlling Minority. For the six of us, I shall proceed to test the Program’s neutrality on its own elements — as we must — even though, for context and contrast, I shall also consider and compare features of other volunteer programs to confirm the uniqueness of Clergy in Schools.
The wide-angle lens fabricated by the Controlling Minority works to obscure the core issue of this appeal, the Program’s neutrality toward religion, by laying a smokescreen of wholly unrelated, truly voluntary programs that are (1) furnished to BISD (not created by it) by pre-existing, external, wholly secular organizations and (2) conducted by their own members (who are not selected by BISD). Only by th'us unduly broadening the framework for its analysis, from the specific program under challenge, i.e., Clergy in Schools, to the entire School Volunteer Program, can the Controlling Minority craft a rationale to support a remand. In fact, quite recently, our colleagues of the Sixth Circuit repudiated the Controlling Minority’s notion that if a “set of [government] programs together comprise a mosaic that is neutral with regard to religion, then the Establishment Clause is not violated.”[7] In Simmons-Harris v. Zelman, that court was unpersuaded by the government’s argument that other, secular educational options available to parents were in any way even relevant to the Establishment Clause analysis of the challenged school voucher program.[8] The court thus flatly rejected the government’s effort to expand the frame of reference for its Establishment Clause analysis beyond the one school program that had been challenged.[9] Like the voucher program, Clergy in Schools is a free-standing government program, which must therefore be tested independently.
Moreover, the Controlling Minority’s avowed purpose of remand is to adduce evidence that I see as not only irrelevant and immaterial but also nonexistent. Indeed, were there evidence of multiple volunteer groups being coordinated by the School District to indoctrinate comprehensively the students of Beaumont public schools in morals and civic virtues, BISD’s able counsel would surely have gotten it into the record.
More astonishing is the fact that BISD has never advanced that it solicits or accepts any other volunteer efforts, much less secular ones, for the purpose of inculcating morality and civic virtues in the students. To the contrary, counsel for the School District candidly admitted at oral argument that Clergy in Schools is the only program designed by BISD to address morality and civic virtues. Yet the Controlling Minority has now “lawyered” this fiction of “programs similar in purpose and function” for the first time on appeal — a ploy that would be summarily dismissed on grounds of waiver if BISD’s lawyers had tried it. The most regrettable side effect of this judicial overreaching is the sweeping of this 3-year-old appeal back under the carpet for the untold additional years it will take for the district court to conduct a futile evidentiary exercise to adduce facts that, even if they existed, would be irrelevant and immaterial, and for us to hear another appeal and, quite likely, another rehearing en banc.
*485 When Clergy in Schools is tested, as it should be, in the proper frame of reference, remand is seen to be entirely futile and unnecessary. As I shall demonstrate, the record is more than sufficient to test the Program for neutrality toward religion — and thus for this court to vote it up or down on summary judgment — -without causing the hollow act of a regrettably lengthy, costly, wasteful, and (it seems to me) improvident remand.[10]
I.
The Neutrality Principle: County of Allegheny v. ACLU[11]
The Supreme Court has repeatedly held that the Establishment Clause requires the government to maintain “a course of neutrality among religions, and between religion and nonreligion.” [12] The granting of preferential treatment according to a purely religious criterion indisputably creates a strong perception of government endorsement of religion,[13] and at times may even directly aid the religiously affiliated in the pursuit of their sectarian endeavors.[14] Endorsement of and direct aid to religion are equally proscribed by the Establishment Clause, and both have consistently been held by the Supreme Court to have the impermissible primary effect of advancing religion.[15] This is why those of my learned colleagues who today would refuse to hold Clergy in Schools unconstitutional have not been able to cite a single *486 case in which the Supreme Court has upheld the government’s use of a religion-preferring selection criterion.
The non-neutrality of the Program’s recruitment criterion endorses religion symbolically. By exclusively recruiting members of the clergy to instruct students in civic virtues and morality, the School District holds the clergy up to its students as those members of the community who are uniquely best-qualified to perform that task.[16] This unmistakable symbolic endorsement of religion strikes at the core concern of the Establishment Clause: The protection of citizens from the specter of government interference and favoritism in the inextricably intertwined domains of conscience, religion, and morality. Furthermore, the Supreme Court has consistently applied a heightened level of scrutiny in the hyper-sensitive venue of public education.[17] In our public schools, more than anywhere else, assiduous attention to neutrality is mandated by the Establishment Clause.
Only by mis reading and mis applying the Supreme Court’s plurality opinion in County of Allegheny v. ACLU,[18] I submit, can the Controlling Minority conclude that the symbolic endorsement effect of BISD’s exclusive recruitment policy may somehow be neutralized or diluted merely by swallowing the nostrum of “other programs similar in purpose and function”[19] operating within the School District’s eclectic volunteer groups. The fundamental difference between the Controlling Minority’s manufactured framework, in which the constitutionality of the School Volunteer Program as a whole — which has never been challenged — must be tested, and my framework, in which the constitutionality of Clergy in Schools’ recruiting and staffing criterion is tested independently, becomes crystal clear in the context of a proper reading of Allegheny.
In Allegheny, the Supreme Court separately tested the endorsement effects of two separately displayed religious symbols, a creche[20] (the sole symbol in a seasonal display inside the County Courthouse), and a menorah[21] (one of several symbols comprising an outdoor seasonal display on public property one block from the County Courthouse). The scenes that the Court separately examined were but two among the Pittsburgh community’s numerous seasonal holiday displays. Importantly, the Court did not examine either religious symbol (the menorah and the créche) or either government display (“Salute to Liberty” and the manger scene) as components of the community’s overall Christmas/Hanukkah/New Year’s seasonal display program — like BISD’s School Volunteer Program, a loose amalgamation of disparate public groups and entities involving separate governmental decisions. Rather, the Court tested each display and each symbol separately, essentially in a vacuum. The reason for the Court’s independent evaluation of the two displays and the two otherwise sectarian symbols is obvious: Even though both symbols and both displays celebrated the same set of year-end holidays, each conveyed a vastly separate and distinct message. Implicit in the Court’s methodology is recognition of the constitutional truism that no message conveyed by the govern *487 ment may have the effect of endorsing religion: The government does not somehow earn a “free shot” to convey a message that does endorse religion simply by conveying other messages that do not.[22]
In Allegheny, the Court evaluated the endorsement effect of each challenged religious symbol and display by focusing on the message that the government’s choice of each communicated, i.e.,“ “what viewers may fairly understand to be the purpose of the display.’ ”[23] The Court concluded that the menorah, which was located next to a Christmas tree more than twice its height and a sign reading “Salute to Liberty,” conveyed a secular message of “pluralism and freedom of belief during the holiday season” and thus did not endorse religion.[24] In contrast, the Court found that the County’s display of the creche violated the Establishment Clause by “sen[ding] an unmistakable message that [the County] supports and promotes the Christian praise to God that is the creche’s religious message.”[25] The Court concluded that the creche display had clearly been independently selected by the County to convey a message separate and distinct from those of other public displays in the community. Although in one sense the creche display, like the “Salute to Liberty” display, was part of a much broader, perfectly constitutional community-wide celebration of the season, in another sense the religion-endorsing message conveyed by that one, single-symbol display rendered it— but not the community’s holiday celebration as a whole — unconstitutional. More significant is the obverse: The fact that the community’s celebration as a whole was constitutional could not rescue, through “equality” or dilution, the government’s creche display from its unconstitutional endorsement of religion.
Even though the Controlling Minority acknowledges that the School District’s clergy-only recruitment policy “suggests that [the clergy] have been chosen as a group because of a perceived expertise in the field of civic virtues and morals,”[26] it nevertheless insinuates that the overarching aegis of the School Volunteer Program may somehow so dilute any message of endorsement as to neutralize the Program’s otherwise unconstitutional preferring of religion.[27] The Controlling Minority, however, mistakes Allegheny Court’s emphasis on the importance of the particular physical setting of the religious symbol displayed — whether, e.g., in a museum, which would neutralize any message of endorsement, or in the seat of county government, which would strengthen any endorsement effect, or in a public school, where the Establishment Clause must be applied “with special sensitivity”[28] — for the appropriate context in which to conduct the constitutional analysis. The Court in Allegheny made clear that the presence of “Santas or other [secular] Christmas decorations” elsewhere in the same building that housed the creche failed to negate, neutralize, or immunize the latter’s endorsement effect.[29] Not even the penumbra of the community-wide holiday celebration program was deemed *488 sufficient by the Court to sanitize the unconstitutionality of the message of endorsement inherent in the display consisting entirely of that one religious symbol.
There is simply no support to be found in Allegheny, then, for the Controlling Minority’s novel theory that the existence of neutral, secular programs similar in purpose and function within the School District could somehow rescue Clergy in Schools — a non-neutral program that, as the Controlling Minority clearly (if not expressly) acknowledges, would have to be held unconstitutional if tested alone on the extant record. In Allegheny, the local government’s use of one religious symbol (the menorah), together with other neutral symbols, to convey a secular message could not legitimate the unconstitutional endorsement effect of the government’s use of a separate, free-standing symbol (the creche) that did convey a religious message only. How, then, could the presence of other, religion-neutral volunteer programs in the schools of Beaumont possibly legitimate the unconstitutional endorsement effect of the clergy-only recruitment policy used by the School District to staff Clergy in Schools? The obvious answer is that it could not and does not. The School District was constitutionally obligated to use a religion-neutral selection criterion to recruit the staff for the Program, and it not only failed to do so, it flatly refused to do so.
Direct evidence already in the record establishes that the School District refused several parental requests to integrate secular professionals into the Program: This cannot be explained on any but religious grounds. Onlookers in the Beaumont community and, more to the point, students in BISD’s schools, cannot help but conclude that the School District recruited the clergy, to the exclusion of all others, to staff its morals and ethics program precisely because it agrees with and exalts the quasi-religious brand of morality that BISD assumes the clergy will convey.[30]
There can be no serious question that, in creating and staffing Clergy in Schools, the School District has overtly advanced religion by granting preferential status to the clergy. Despite boldly (and, based on the summary judgment evidence, pretextually) rationalizing its clergy-only criterion as a proxy for communication skills, the School District has made no effort to identify a subset of skilled communicators among the set of all local clergymen. BISD’s invitations went out to any and every member of the community whom the School District could identify as an ordained or self-proclaimed minister. And BISD did so without making any effort whatsoever to consider, much less determine, other religion-neutral credentials or qualifications of these ministerial invitees. The School District even ignored warnings voiced by one of its own hand-picked clergy participants that it had cast its clergy-only net too widely, recruiting many ministers who had no formal training in interpersonal counseling.[31]
The undeniable perception that this exclusive recruitment policy endorses religion is magnified by the undisputed record *489 evidence that Clergy in Schools is the only volunteer program (1) designed exclusively by the School District (2) for which the School District actively recruits the individual participants. We are not reviewing a situation in which the government has simply accepted an offer of help from a pre-existing outside organization that coincidentally happens to be religiously affiliated. On the contrary, by creating its own ministerial organization, the School District has purposefully targeted the clergy, building Clergy in Schools around them from the ground up. As the summary judgment record confirms, the School District conceded that (1) it never created from scratch any of the other programs, (2) no other program is conducted by an organization that was not pre-existing, and, most importantly, (3) Clergy in Schools is the only volunteer program in the entire galaxy of such programs for which the School District both designated and applied the selection criterion for choosing volunteers rather than accepting self-selected volunteers. BISD had ample opportunity during the district court proceedings to adduce evidence to the contrary but never did so — for the best of all possible reasons: none exists.
The recent Supreme Court case of Mitchell v. Helms[32] highlights this critical distinction between, on one hand, a program like Clergy in Schools that is “volunteer” in name only and for which each and every constitutive decision is attributable to the government and to the government alone; and, on the other hand, bona fide volunteer programs, such as the ones offered to the School District by the Junior League or the Kappa Alpha Psi-Fraternity,[33] that are the result of “the genuinely independent and private choices of individuals.”[34] In Mitchell, a plurality of the Court emphasized that “if numerous private choices, rather than the single choice of a government,” determine the beneficiaries of a government program “pursuant to neutral eligibility criteria, then a government cannot, or cannot easily, grant special favors that might lead to a religious establishment.”[35] It follows, then, that even if on remand the School District could point to other volunteer programs such as the Boy Scouts in which civic virtues and morality are addressed, the existence of any such programs, the staffing and goals of which are solely attributable to the private choices of individuals, still can do nothing to mitigate the religion-preferring choice that is the sole issue in this case and that is wholly attributable to government: BISD’s conscious decision to restrict participation in the Program to the clergy and the clergy alone.
Frankly, I am mystified that anyone can read the entire record in this case, even, as we must, in the light most favorable to the non-moving School District, and somehow conclude that it is insufficient to support— even compel — a holding that (1) the School District’s exclusive recruitment policy creates a perception of religious favoritism and (2) the School District has selected the clergy to staff the Program on the basis of religious credentials rather than on the basis of one or more neutral criteria. If Clergy in Schools were emblematic of a *490 general policy under which the School District itself actively recruited members of many professions and vocations, and thereafter assigned them to homogenous volunteer sub-groups segregated by profession, one might at least argue that the Program is neutral with respect to religion. Such a policy would be more in keeping with the Supreme Court’s recent admonition that neutrality, together with private choices, is necessary to eliminate any possible attribution to the government of a religion-preferring message.[36] The clergy certainly are not consigned to a disfavored status by the Establishment Clause, and they may participate freely in the public sphere.[37] But the record is totally devoid of evidence of any such plan or policy in the School District; were it otherwise, able counsel for the School District surely would have had the record so reflect.
Notwithstanding the Controlling Minority’s protestations to the contrary, the record contains a surfeit of evidence confirming beyond cavil that the religious credentials of the clergy — and only these credentials — were what the School District looked to when it proceeded to implement its exclusive recruitment policy. Conversely, the record contains not a scintilla of evidence that BISD ever made any attempt to recruit volunteers across the board, then separate them according to vocation. The Controlling Minority implies that in limiting participation in the Program to clergy only, the School District was simply following a policy favoring the segregation of different professional groups into separate volunteer programs. The record is simply not susceptible of any such reading, and there is no justification for giving BISD another opportunity to make it read that way. The record shows that the only other program in the School District that is composed of a single vocational group,[38] the DARE (Drug Abuse Resistance Education) program, is not a volunteer program at all. The DARE curriculum, including content, materials and testing, was adopted by the Texas Education Agency, and is taught by specially trained and certified law enforcement officers as part of their job responsibilities.[39] Furthermore, School Volunteer Program Coordinator Joy James testified that, even though all of the volunteers in each of the School District’s “school-business partnerships” share the same employer, the volunteers have diverse vocations and different areas of substantive expertise.
Neither did the School District advance even one of its myriad “other” volunteer programs as paralleling Clergy in Schools’ purpose of inculcating morals and civic virtue. This lacuna is no accident: Were there any such evidence “out there,” the *491 record would contain it. Simply put, there is no just reason to consign this case to the additional multi-year delay of a remand just to re-confirm this truism.
The undeniable inference of preferring religion that springs from the special treatment accorded to the clergy by BISD is strengthened by the circumstances in which the Clergy in Schools program was created.[40] The School District cannot acknowledge, on one hand, that one of its purposes in creating Clergy in Schools was to “[help ministers] know better how to attend to needs of young people in church,” then claim, on the other hand, that its exclusive recruitment policy was instituted without regard to the clergy’s religious credentials and functions. Similarly, the School District’s dogged resistance to including secular professionals in the Program — even those professionals whom it has acknowledged under oath possess the same skills and qualifications as do the clergy — can only be explained by stating the obvious: The School District deemed the clergy’s pastoral vocation to be the distinguishing characteristic that set them apart in a class of their own.
Indisputable in the record is the fact that the School District has lavished special attention on the clergy that has not been accorded to any other vocational or volunteer group. And we are not, as a matter of law, permitted to presume that other, secular groups will receive similar preferential treatment in the future: The Supreme Court flatly rejected such an approach in Kiryas Joel, noting that “we have no assurance that the next similarly situated group [will receive similar treatment].”[41] The School District’s actions must stand or fall on the palpably sufficient summary judgment record in this case. Whatever else may be “uncertain” in that record, the Program’s lack of neutrality toward religion is not; to the contrary, overt favoritism towards religion is amply established.
II.

Non-secular Purpose

The vigilance of the courts in maintaining religion-neutrality is at its most indispensable when questions regarding the establishment of religion arise in the arena of our public schools.[42] For that is where the political majority experiences the greatest temptation to use its public power to enforce the dictates of its own belief system, and that is where the audience is most impressionable, malleable, and vulnerable. School boards and administrators across the country must regularly make difficult decisions concerning how to instill morality and civic virtues in our children without inculcating religion in the process. In drawing the necessary dividing lines between civic virtues and a religious perspective on those Virtues, it is critical that school boards and officials remain sensitive to the susceptibility of their charges' to even the subtlest of influence and ensure that students are provided an educational environment in which religion is not put into play.[43]
Our public educators are both constrained and aided in their decisionmaking by the relatively clear and simple neutrality rules that are imposed by the Establishment Clause: Leave religion out of the *492 equation;[44] do not use religious symbols as part of the educative process;[45] do not conduct formal religious exercises on school property;[46] do not tailor a curriculum to foster religious beliefs;[47] do not use a selection criterion that favors religion in hiring, in choosing educational materials, or in designating extracurricular activities.[48]
Regrettably, BISD transgressed these well-established boundaries when it created the Clergy in Schools program. The central idea of the Program — to educate students about morality and civic virtue— is not just permissible; it is commendable. And the Does have not challenged that idea; neither have they challenged the School District’s inclusion of clerics in the Program. Where the School District knowingly crossed the bright line that separates the permissible from the impermissible, however, was in deliberately ehoos-ing to limit participation in the Program exclusively to clergymen. The only purpose that the School District could possibly have had in consciously excluding members of all other vocations and professions from participating in the Program was to ensure that the students it would select to attend the sessions and be instructed would receive a perspective on morality grounded in religion.[49] That is not a religion-neutral purpose, and that is not permissible under the Establishment Clause.
If a government action is deemed to have been taken for the purpose of favoring, advancing, or endorsing religion, then no further analysis is required to conclude that an Establishment Clause violation has occurred.[50] This bedrock principle of Establishment Clause jurisprudence is best recognized today as the first prong of the so-called Lemon test, which assays the purpose of a government practice to determine whether that purpose is sectarian.[51] *493 The challenged government practice in the instant case is the School District’s decision exclusively to recruit clerics to staff the only volunteer program that was designed by the School District to address civic virtues and morality and for which the School District actively seeks participants.
Purpose is assessed as of the time the government decision in question is made.[52] We look first to the explanation offered by the government in support of its decision.[53] If the proffered explanation is patently inadequate or if there is reason to believe that it is a sham, we turn to the events surrounding the making of the governmental decision as contextual evidence of the government’s true purpose.[54] Contemporaneous statements and incidents are highly relevant to this inquiry, even when, as here, the constitutional challenge is facial only.[55]
The School District has offered no plausible secular explanation in support of its decision exclusively to recruit clergy to staff the Program. As I have noted, the School District on several occasions was urged by concerned parents and participating clergy to integrate laymen and diverse professionals into the Program, and on each occasion the School District flatly refused. Superintendent Thomas, who first conceived of Clergy in Schools, and Joy James, who serves as coordinator of the School Volunteer Program, were asked in their courtroom testimony to justify the School District’s initial and subsequent decisions to exclude all other vocations from the Program. Both conceded under questioning that mental health professionals, such as psychologists and social workers, have the same level of counseling and communication skills as do the clergy, and that they would provide equally good role models for the students. Nevertheless, these school administrators insisted that the clergy qua clergy possess some special quality justifying the School District’s decision actively to recruit them to the exclusion of all other professions. James, after stating that she did not believe that “there would be any harm” in including secular professionals in the Program, explained that the School District did not do so because:
[Tjhat’s not necessarily part of the mission that we are hoping to accomplish with Clergy in Schools.... Because the Clergy in Schools follows a particular mission, which has been stated earlier today.... Let me just say that we’re tapping the expertise of the clergy for this particular program, okay? ... If we’re doing something in the area of engineering, engineers, we’re not going to ask an accountant to come in and work with them if they’re talking about engineering business for that’s the expertise the engineers can give us in that particular program.
*494 When these remarks are viewed in pari materia with the School District’s concession that mental health professionals have counseling skills equal to those of clergy-members and that they are equally good role models, it becomes clear that James could only have been referring to a substantive expertise that the School District considers to be possessed by the clergy and no others. But, whereas engineers clearly do possess a unique substantive expertise in matters of engineering that accountants lack, clerics have no corner on the substantive expertise market in matters of virtue and morality (as distinct from theology) — at least none that the Establishment Clause permits the government to recognize and act on. The School District’s “particular mission” in implementing the Clergy in Schools program— to impart to students the particular brand of morality that it expected the clergy to convey[56]- — does not come close to articulating a permissible purpose under the Establishment Clause.
The events surrounding the creation of Clergy in Schools, which are well documented in the record, permit no inference other than that the School District’s exclusive recruitment policy was religiously motivated from its very inception. In distributing pamphlets to engender support for the Program, the School District was quite candid about its intent to aid the clergy in their religious as well as their secular endeavors.[57] The informational materials proudly declare that the program will “provide more volunteer opportunities for clergy,” “expos[ing] members of the clergy to the real world of today’s students.” They further advance that “by ministers being exposed to problems of schools” they “will be aware of problems in schools and know better how to attend to needs of young people in church.”[58]
The record evidence describing other contemporaneous incidents only serves to bolster the conclusion that the School District initiated its exclusive recruitment policy for the purpose of pursuing constitutionally impermissible ends. Shortly before implementing Clergy in Schools, Superintendent Thomas delivered a speech to a group of clergymen about the need to return prayer to the public schools. On a strictly personal level, he is entitled to this view, and there is no evidence in the record that as Superintendent he has ever overtly acted on this specific goal.[59] Nev *495 ertheless, the Superintendent’s vocal support of school prayer girds the burgeoning impression that Clergy in Schools was intended by the School District to interject as much religion as it could get away with into the public school system.
So, too, does the School District’s distribution of a leaflet entitled “Reasons for a School-Church Alliance” at its first Clergy in Schools organizational meeting. Neither the fact that the flyer was initially prepared by the president of the PTA nor the School District’s posi-litigation disavowal of the document can change the firmly established fact that, at the time of the organizational meeting, the School District found the views expressed in the flyer to be sufficiently coextensive with its own that it elected to distribute that brochure.[60] Rabbi Hyman, who attended that organizational meeting, testified that he came away with the distinct impression that the flyer “was obviously put in there to engender some support and provide some facts for this kind of program.”
Not once has the Supreme Court upheld a government program that so blatantly endorses religious professionals as uniquely competent to pursue public ends, or one that so frankly declares its intent to aid religious leaders in their sectarian endeavors. That a program, taken as a whole, may be directed toward a constitutional end has never before been permitted to shield essential features of such program from individual constitutional scrutiny.
In Wallace v. Jaffree, for example, the Supreme Court invalidated a government-mandated moment of silence that was set aside by the Alabama State legislature for “meditation or voluntary prayer.”[61] Although five Justices expressed the view that moments of silence generally have a legitimate secular purpose,[62] the Court nevertheless struck down the particular moment of silence then under review because the Justices could discern no secular purpose for the addition of the words “or voluntary prayer” in the implementing statute. Similarly, in Edwards v. Aguillard, the Court invalidated the Louisiana Creationism Act for lack of a secular purpose even though the science curriculum of which it was a component part clearly pursued a legitimate secular end.[63] In like manner, when the Program is tested for a secular purpose, the governmental decision to recruit only clergy to conduct this morals and ethics program cannot stand. It’s just that simple.
III.

The Supreme Court’s Establishment Clause Tests

My discussion of the neutrality requirement in Part I of this opinion is independently sufficient to demonstrate that the School District’s clergy-only recruitment policy is patently unconstitutional. Nevertheless, to square my dissent against the accompanying opinions that deny the Program’s unconstitutionality and to expose their flawed legal reasoning, I will also assess briefly the Program’s constitutionality by running Clergy in Schools through the battery of tests designed by the Su *496 preme Court to determine the compatibility of government action with the Establishment Clause.
The Supreme Court assesses compliance with the Establishment Clause through three separate tests: Coercion, Endorsement, and the so-called Lemon test. As the Program’s counseling sessions do not constitute formal religious exercises, the coercion test is inapplicable to the instant case. And I have already demonstrated, in part I above, that the clergy-only recruitment and staffing policy of Clergy in Schools fails the Endorsement test by conveying the unconstitutional message that the School District favors religion over nonreligion.[64] All that remains is to confirm that Clergy in Schools cannot clear even one prong of the tripartite Lemon test.
A. The Lemon Test’s First Prong: Secular Purpose
We first look to see whether the government action in question had a secular purpose.[65] If the action is determined to have been taken for the purpose of favoring, advancing, or endorsing religion, “no consideration of the second or third criteria of Lemon is necessary.”[66] I have already shown, in part II of this opinion, that the summary judgment record contains a surfeit of evidence that the Program’s clergy-only recruitment and staffing policy was implemented by BISD for the unconstitutional purpose of endorsing a distinctly religious approach to the inculcation of morality and civic virtues. When tested under Lemon’s, disjunctive secular purpose prong, therefore, the School District’s decision to recruit only clergy to conduct the Program cannot stand.
B. The Lemon Test’s Second Prong: Primary Effect
Both the Endorsement Test and the second prong of the Lemon test, which the Controlling Minority examines in tandem, inquire whether the challenged government program has the primary effect of advancing religion by conveying a message that religion is preferred over nonreligion. As such, the ultimate question under both tests is whether the challenged program is neutral toward religion.[67] I have already demonstrated, in part I of this opinion, the flagrant non-neutrality of BISD’s policy of recruiting only clergy to staff the only volunteer program designed by the School District to inculcate morality and civic virtues. Accordingly, Clergy in Schools does not pass constitutional muster under either the Endorsement test or the second prong of Lemon. Nevertheless, as astonished as I am at the boldness of the Controlling Minority Opinion in “presuming] that the clergy will comply with the program’s secular guidelines” and refrain from any indoctrination of religion, I admire its subtle cleverness in leading the gullible down that primrose path.[68] Even though the Supreme Court has abandoned the presumption that public school teachers assigned to religious schools will inevitably indoctrinate their students in religion,[69] in Mitchell v. Helms,[70] five- Justices (O’Con-nor, Breyer, Souter, Ginsburg, and Stevens) reaffirmed the Court’s longstanding *497 converse presumption — precisely opposite the presumption slipped in by the Controlling Minority — that religious instructors will inevitably interject religion into their lessons even when teaching purely secular topics.[71] It is inconceivable that the Ball presumption would not be applied “in spades” to full-fledged religious ministers teaching classes in public schools on such a religion-related topic as morality. Other than calling the Controlling Minority’s hand on this bit of legerdemain, however, I refrain from expressing any opinion on this issue because we need not reach it to conclude that, as currently constructed, Clergy in Schools is unconstitutional.
C. Third Prong of the Lemon Test: Entanglement
In the wake of the Supreme Court’s decision in Agostini v. Felton,[72] Lemon’s third prong has evolved as the least defined of the Establishment Clause tests. It is now clear that “[e]ntanglement must be ‘excessive’ before it runs afoul of the Establishment Clause.”[73] Equally clear is the truism that, in determining whether the entanglement effect of a particular government action is excessive, “the resulting relationship between the government and [the] religious authority” is a critical factor.[74] But to date the Supreme Court has offered scant guidance as to what quality and quantity of entanglement is excessive, leaving the inferior courts to puzzle through this analysis on our own.
Because this particular facet of the law, dealing as it does with Establishment Clause analysis, is so ill-defined, and because both the first and second prongs of the disjunctive Lemon test provide sufficient independent bases on which to declare the School District’s exclusive recruitment policy — and, therefore, Clergy in Schools — facially unconstitutional, I refrain from analyzing the entanglement aspect of the Program in great detail. I cannot help but note in passing, however, that when the government invites clergymen qua clergymen to come into its public schools and refuses to invite any others, thereby publicly according the clergy “most favored nation” status; when the government conducts organizational meetings with clergy participants at local churches; when the government encourages the clergy who attend those meetings to pray before going into the schools; when the government creates ab initio a clergy-only volunteer group and asks that group to conduct a morals and ethics program in the public schools; when the government openly declares that a central purpose of that program is to help the clergy better minister to their congregations; and when school administrators greet the clergymen and shepherd them into classrooms, select the students to be counseled, and remain in the sessions to steer, guide, and control the proceedings, I find it impossible — at least without donning blinders — to conclude that the resulting entanglement between Church and State is anything short of “excessive.” Were it necessary to do so, I would hold that Clergy in Schools in its entirety, with the School District’s clergy-only recruiting policy at its core, fails the third prong of the Lemon test as well, leaving the Program without a single constitutional foothold from which to claim conformity with the dictates of the Establishment Clause and its central theme of neutrality toward religion.
IV.

Standing

Although I concur in holding that the Does have standing to press their claims *498 before this court, the Controlling Minority’s anvil-like subtlety in warning that “standing must be demonstrated at all stages, including trial”[75] compels me to offer a few words of my own on the subject. Even though it blurs the concepts of Equal Protection and the Establishment Clause, I do not choose to take issue with the pronouncement of the Controlling Minority that the exclusion of the Does from the benefits' of a school-financed program in which they cannot in good conscience participate suffices as a cognizable injury for purposes of standing. I do, however, view the ever-present threat of forced or coerced inclusion in such a program as an even stronger ground for finding standing, especially now that remand will inevitably prolong the exposure of the Does and others similarly situated to a religion-preferring activity. I must respectfully take issue, therefore, with what I view as Judge Jolly’s misreading of the Supreme Court’s decision in Valley Forge.[76]
A fair reading of Valley Forge makes clear that the threat of being selected by the School District to attend a Clergy in Schools session is sufficient to confer standing on the Does to seek “pre-expo-sure” relief from the federal courts.[77] That they have not yet suffered any direct psychological harm is irrelevant; after all, the plaintiff in Lee v. Weisman was allowed to challenge a school district’s use of graduation prayers four years prior to her scheduled graduation.[78] As the Supreme Court stated just months ago in Santa Fe, “the simple enactment of this policy, with the purpose and perception of school endorsement of [religion], was a constitutional violation. We need not wait for the inevitable to confirm and magnify the constitutional injury.”[79] Neither is it material that the school children, including the Doe children, are permitted by the School District to “opt out” of the Program. “Opt out” clauses have long been considered by the Supreme Court to be constitutionally irrelevant.[80] Finally, the fact that it may be statistically unlikely that any of the individual plaintiffs will be selected to participate in the School District’s ongoing Program is of no moment: If it were, the government would always be able to defeat pre-enforcement challenges merely by randomizing the occurrence of unconstitutional events that it wished to sponsor.[81]
Once again, context is all-important. As plaintiffs, the Does have presented ample record evidence to show that every single day that their children attend school they are subjected to the threat of a constitutional injury. The Does are in no way comparable to the Valley Forge plaintiffs, who had only the most abstract and geographically remote of interests in bringing their challenge. The Does do not merely disagree in a general, intellectual sense with the School District’s actions; rather, they object to their children’s being forced personally to run the risk every day of being subjected to a religion-endorsing *499 program that operates in their very own schools.[82] This ever-present, tangible risk, faced in the very school buildings that they are compelled by law to attend, is more than sufficient to vest the Does with Article III standing, as injured parties, to bring their complaint.[83]
V.

Conclusion

The existing record establishes beyond cavil that the School District’s clergy-only recruitment policy is clearly unconstitutional: It endorses religion by holding the clergy up to the students, parents, and citizens of Beaumont as exclusively superi- or teachers and inculcators of moral attitudes, beliefs, and practices. The clergy may, of course, consistent with the Establishment Clause, freely participate in the public sphere; but the Establishment Clause does not permit the government to accord them such favored status.
The Controlling Minority’s insistence on analyzing the School Volunteer Program as a whole deliberately loses sight of the trees for the forest by side-stepping the one issue that we have been called on to address: The constitutionality of the School District’s clergy-only recruitment and staffing policy. On the strength of the extant record, that policy, when forthrightly tested for neutrality pursuant to Allegheny and properly viewed through the lens of the Supreme Court’s Establishment Clause tests, is indisputably unconstitutional. The fact that a case requires us to draw close and difficult lines in an area as sensitive as the Establishment Clause does not relieve us of our duty to decide it. It is for these reasons that I respectfully but strenuously dissent from this court’s failure to grant summary judgment to the Does, and from its remand of this case to the district court to perform what I perceive to be a stereotypical hollow act.

. Since the granting of en banc review in this case, Judge Politz has elected senior status. He remains, however, a member of the en banc court by virtue of his active status at the time that en banc review was granted.

. See Black's Law Dictionary 1154 (6th ed.1990) ("[a]n opinion of an appellate court in which more justices join than in any concurring opinion (though not a majority of the court)”).

. See Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (“When a fragmented Court decides a case ... the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.”).

. Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

. See Controlling Minority Opinion at 464 ("The ultimate question in this Establishment Clause case is equality of treatment: whether the school preferred religion over non-religion.”).

. 530 U.S. 793, 120 S.Ct. 2530, 2557-58, 147 L.Ed.2d 660 (2000) (O'Connor, J., concurring) (punctuation and citation omitted).

. See Controlling Minority Opinion at 464.

. 234 F.3d 945, 958 (6th Cir.2000) ("Analyzing the scholarship program choices as compared to choices or schools outside the program is asking this Court to examine the entire context of Ohio education. Such a question is not before this court.... [T]he school voucher program, and only the school voucher program, was challenged by Plaintiffs in this lawsuit.... We may not view’ these two programs as inextricably interdependent when the plain language of the statutory scheme demonstrates the opposite.... [W]e are presented only with the question of whether the school voucher program violates the Establishment Clause, and we must limit ourselves to that issue, regardless of the temptations Defendants’ arguments present.”).

. Id.

. As the primary purpose of this dissent is to demonstrate that the Does are entitled to summary judgment, I shall throughout this opinion construe the facts in the light most favorable to the School District. Under the summary judgment standards recently articulated by the Supreme Court, “the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.” Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000).

. 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989).

. See Bowen v. Kendrick, 487 U.S. 589, 607, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988). See also School Dist. of Abington Twnshp. v. Schempp, 374 U.S. 203, 225, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (striking down a school program because of its "breach of neutrality”); Roemer v. Bd. of Public Works of Maryland, 426 U.S. 736, 747, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (“Neutrality is what is required”); Bowen, 487 U.S. at 607, 108 S.Ct. 2562 (upholding a grant program that “reflect[ed] ... [a] successful maintenance of a course of neutrality among religions, and between religion and nonreligion”); Wallace v. Jaffree, 472 U.S. 38, 60, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (ruling that the characterization of prayer as a favored practice "is not consistent with the established principle that the government must pursue a course of complete neutrality toward religion”); Bd. of Education of Kiryas Joel Village School Dist. v. Grumet, 512 U.S. 687, 709, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) ("the statute before us fails the test of neutrality.”); Mitchell, 120 S.Ct. at 2541 (2000) (plurality) ("we have consistently turned to the principle of neutrality”).

. See Kiryas Joel, 512 U.S. 687, 114 S.Ct. 2481, 129 L.Ed.2d 546.

. See, e.g., Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989) (plurality) (invalidating a tax exemption applicable only to religious publications).

. See, e.g., Wallace, 472 U.S. at 60, 105 S.Ct. 2479 (striking down a moment of silence "enacted ... for the sole purpose of expressing the State’s endorsement of prayer activities”); Texas Monthly, 489 U.S. at 17, 109 S.Ct. 890 (tax exemption limited to religious periodicals "effectively endorses religious belief”); County of Allegheny v. ACLU, 492 U.S. 573, 593-94, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) ("The Establishment Clause, at the very least, prohibits government from ... making adherence to a religion relevant in any way to a *486 person’s standing in the political community”) (punctuation and citation omitted).

. See, e.g., Bowen, 487 U.S. at 604-05, 108 S.Ct. 2562 (observing that the government is not allowed to convey the message that a religiously affiliated group is uniquely well-qualified to perform a particular task).

. See, e.g., Edwards v. Aguillard, 482 U.S. 578, 583-84, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987).

. 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989).

. See Controlling Minority Opinion at 464.

. A "creche” is a tableau of the stable scene at Bethlehem, with the infant Jesus surrounded by the adoring Mary, Joseph, shepherds, and magi.

. A "menorah” is a candelabrum used in the celebration of Hanukkah.

. So, for example, a public school cannot, by virtue of having offered religion-neutral courses such as history and chemistry, empower itself to offer a religion-fostering course in, say, Jewish theology, scripture and prayer.

. Allegheny, 492 U.S. at 595, 109 S.Ct. 3086, quoting Lynch v. Donnelly, 465 U.S. 668, 692, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O’Connor, J., concurring).

. Allegheny, 492 U.S. at 635, 109 S.Ct. 3086 (O'Connor, J., concurring).

. Allegheny, 492 U.S. at 600, 109 S.Ct. 3086.

. See Controlling Minority Opinion at 471.

. Id.

. The Court explicitly noted that even the display of a menorah alongside a Christmas tree might raise additional constitutional questions if located in a public school. See Allegheny, 492 U.S. at 629 n. 69, 109 S.Ct. 3086.

. Id. at 598 n. 48, 109 S.Ct. 3086.

. It is hardly a coincidence, then, that the newspaper article that originally alerted the Does to the Program begins, "In an age when police officers roam the halls to enforce the peace, Beaumont school Superintendent Carroll Thomas would like to see ministers in the same place enforcing values.”

. The Reverend James Fuller wrote to the local school board and to Superintendent Thomas, advising them that they needed a "[b]etter understanding of which categories of ministers are appropriate participants. Categories represented in the first visit included: pastors, associate pastors, lay ministers, [and] lay chaplains. Some of these participants have educational training in ministry while some do not.” In a separate letter, Reverend Fuller specifically complained that another clergy participant in the program "does not have the temperament, experience, or credentials to participate in the kind of program which Dr. Thomas envisions.... [He] will be perceived as self-righteous and abrasive by students and I am not willing to risk such associations.”

. 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660.

. The participation of these groups, in particular, in the School District’s volunteer program underscores the importance of this distinction. Membership in the Junior League is restricted to women; the membership of the fraternity is composed solely of African-American men. The constitutionality of such explicitly discriminatory selection criteria, if used hy the government, would have to survive heightened scrutiny and strict scrutiny, respectively, and it seems doubtful that either could hold up under such exacting analysis. See, e.g., Wygant v. Jackson Bd. of Ed., 476 U.S. 267, 276, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (concluding that school board's policy of extending preferential protection against layoffs to some employees on the basis of race could not be justified by the school board’s interest in providing minority role models).

. See Mitchell, 120 S.Ct. at 2541.

. See id. (emphasis added).

. See Mitchell, 120 S.Ct. at 2530.

. See, e.g., McDaniel v. Paty, 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978) (invalidating a provision of the Tennessee constitution disqualifying clergy from holding public office).

. In a letter written four days prior to trial and addressed to "all clergy,” Superintendent Thomas asserted that "[i]n an effort to broaden volunteer opportunities for other professional groups and to tap other underutilized community resources, [BISD] has taken steps to actively recruit other volunteers including: (1) Federal Correctional Officers; (2) Lamar Student Government; [and] (3) National Association of Blacks in Criminal Justice.” Superintendent Thomas's letter has no apparent purpose other than to serve as a trial exhibit; unlike other letters that he sent to the clergy, he did not even bother to sign it. Indeed, there is no evidence in the record that the letter was ever distributed to the purported addressees. The credibility of the letter is further called into question by the fact that the three volunteer groups mentioned in it are not mentioned anywhere else in the record. Superintendent Thomas’ letter certainly does not constitute the kind of "uncontradicted and unimpeached ... evidence com[ing] from [a] disinterested witness” on which summary judgment can be based. See Reeves, 120 S.Ct. at 2110.

.See generally Bureau of Justice Assistance, An Introduction to Dare: Drug Abuse Resistance Education (2d. ed.1991).

. "Our inquiry into this question not only can, but must, include an examination of the circumstances surrounding its enactment." Santa Fe Independent School District v. Doe, 530 U.S. 290, 120 S.Ct. 2266, 2282, 147 L.Ed.2d 295 (2000).

. 512 U.S. at 703, 114 S.Ct. 2481.

. See Aguillard, 482 U.S. at 583-84, 107 S.Ct. 2573 ("The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools.”).

.See Santa Fe, 120 S.Ct. at 2280 (striking down a government-created student election mechanism that "encourage [d] divisiveness along religious lines in a public school setting, a result at odds with the Establishment Clause.”)

. The government can, of course, make use of the secular aspects of religious texts, icons, and individuals. For example, a school district could certainly use the Bible as one of several texts in a comparative religion class. In so doing, however, the government must focus solely on the secular value of such materials: Religion qua religion can never truly be permitted to become a factor in government decision-making.

. See Stone v. Graham, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1981) (Ten Commandments).

. See Abington, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (Bible readings); Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (classroom prayer).

. See Aguillard, 482 U.S. at 587, 107 S.Ct. 2573 (creationism); Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (creationism); McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948) (sectarian classes on public school campuses).

. See, e.g., Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (requiring equal access to school facilities for all extracurricular groups); Texas Monthly, 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (invalidating a tax exemption applicable only to religious publications); Kiryas Joel, 512 U.S. 687, 114 S.Ct. 2481, 129 L.Ed.2d 546 (invalidating the New York State legislature's use of a religion-preferring criterion in establishing school districts); Santa Fe, 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (striking down a government-created student election mechanism used to select student speakers at football games).

. It is no coincidence that one of the clerical participants in Clergy in Schools slipped at one point in a counseling session and quoted the Bible: To him, the Bible was the source of the moral truth that he was speaking. Quotations, of course, can be restrained by administrative policing, but perspectives surely cannot: It is unavoidably a religious view of morality that is offered to students by the Clergy in Schools program, at least as it is currently constructed. See Mitchell, 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660, in which five Justices (O’Connor, Breyer, Souter, Ginsburg, and Stevens) reaffirmed the Court’s longstanding presumption that religious instructors will inevitably interject religion into their lessons even when teaching purely secular topics. Rabbi Hyman, one of the participants in the program, expressed exactly this concern in his record testimony.

. Aguillard, 482 U.S. at 585, 107 S.Ct. 2573.

. See Lemon, 403 U.S. at 612, 91 S.Ct. 2105. The Lemon test has fallen into disfavor with several of the Justices currently sitting on the *493 Supreme Court. See Santa Fe, 120 S.Ct. at 2284-85 (Rehnquist, C.J., dissenting) (setting forth a list of opinions in which the Lemon test has been criticized). Nevertheless, the Supreme Court continues to apply the Lemon test, see Santa Fe, 120 S.Ct. at 2281. I discuss the Program's failure of the Lemon test in greater detail in Part III, infra.

. See generally Aguillard, 482 U.S at 585-96, 107 S.Ct. 2573; Wallace, 472 U.S. at 56-61, 105 S.Ct. 2479.

. Aguillard, 482 U.S. at 585-86, 107 S.Ct. ISIS.

. Id. at 586-87, 107 S.Ct 2573. Presumably subscribing to the maxim that an offense is the best defense, the Controlling Minority accuses me of ignoring the relevancy of context in Establishment Clause analysis. On the contrary, context is the "clincher” in this case, as it is in almost every Establishment Clause case. See Santa Fe, 120 S.Ct. at 2282 ("Our inquiry into this question not only can, but must, include an examination of the circumstances surrounding its enactment.”).

.See Aguillard, 482 U.S. at 595, 107 S.Ct. 2573. See also Santa Fe, 120 S.Ct. at 2282 ("To properly examine this policy on its face, we must be deemed aware of the history and context of the community and forum.”) (punctuation and citation omitted).

. Although the Controlling Minority dismisses James's testimony, see Controlling Minority Opinion at 469, it studiously avoids offering any alternative explanation as to what "particular mission” the School District could possibly have had in mind for the clergy that would have been interfered with by adding other professionals to the program.

. BISD has not gone to any great lengths to conceal its religion-fostering purposes: In her closing argument to the trial court, the School District’s attorney declared that the Clergy in Schools program has "a two-fold mission, not . just one, your honor, and it's clear from our mission statement that part of this program, a large part of this program, is to educate the clergy about what it is really like to be a student in BISD.” Teaching clergy how better to minister to their flocks is not a constitutionally legitimate end for a public school district to be pursuing.

. This statement, the functional equivalent of which appears in at least two BISD documents, clearly represents what the School District considered to be a positive accomplishment of the Clergy in Schools program. The Controlling Minority's contention that the statement appears in the agenda of the School District’s meeting as nothing more than an inducement for the clergy to join the program, see Controlling Minority Opinion at 469, is nothing short of ludicrous. By that reading of the document, "Morning Meetings — 10:00 a.m.,” which appears in the same column in the document, would also represent an inducement, which makes no sense at all. Moreover, with admirable candor, the School District has admitted throughout the course of this litigation that one of the primary goals of Clergy in Schools is'to make the clergy more effective in performing their church-related duties.

.There is, however, evidence in the record that Superintendent Thomas frequently blurred the line between State and Church functions. For example, on at least one occasion he requested area clergy to deliver sermons on designated education-related topics.

.In flagrant disregard of the uncontested record testimony of Superintendent Thomas and Rabbi Hyman — key witnesses for opposing sides in this litigation — the Controlling Minority baldly declares that the PTA President not only created the document, but also personally distributed it. See Controlling Minority Opinion at 465-66. Nothing in the record supports this contention. To the contrary, Superintendent Thomas testified quite plainly that the document "was distributed by us” at an organizational meeting of Clergy in Schools.

. 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (emphasis added).

. Justice Powell, 472 U.S. at 62, 105 S.Ct. 2479; Justice O’Connor, 472 U.S. at 76-77, 105 S.Ct. 2479; Justice Burger, 472 U.S. at 84-90, 105 S.Ct. 2479; Justice White, 472 U.S. at 90-91, 105 S.Ct. 2479; and then-Justice Rehnquist, 472 U.S. at 91-114, 105 S.Ct. 2479.

. 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510(1987).

. See Allegheny, 492 U.S. at 592-93, 109 S.Ct. 3086 (1989).

. See Santa Fe, 120 S.Ct. at 2281 ("Our Establishment Clause cases involving facial challenges ... have not focused solely on the possible applications of the statute, but rather have considered whether the statute has an unconstitutional purpose.”).

. Aguillard, 482 U.S. at 585, 107 S.Ct. 2573 (punctuation omitted).

. Lemon, 403 U.S. at 612, 91 S.Ct. 2105. As the instant case involves a facial challenge only, individual incidents that have occurred during the operation of the Clergy in Schools program are irrelevant to this inquiry.

. See Controlling Minority Opinion at 469.

. See Agostini v. Felton, 521 U.S. 203, 223-28, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).

. 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000).

.See, e.g., School District of Grand Rapids v. Ball, 473 U.S. 373, 399-400, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985) (O’Connor, J., concurring in the judgment in part and dissenting in part), overruled in part by Agostini, 521 U.S. at 236, 117 S.Ct. 1997.

. 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).

. Id. at 233, 117 S.Ct. 1997.

. Id. at 232, 117 S.Ct. 1997.

. See Controlling Minority Opinion at 465.

. Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

. Id. at 472, 102 S.Ct. 752 ("Article III requires the party who invokes the court’s authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.”) (punctuation and citation omitted) (emphasis added).

. 505 U.S. 577, 584, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992).

. 120 S.Ct. at 2282.

. See Abington, 374 U.S. at 225, 83 S.Ct. 1560 ("Nor are these required exercises mitigated by the fact that individual students may absent themselves upon parental request[.]”).

. Imagine, if you will, a teacher drawing a number out of a hat at the start of each class day, and then engaging in a Bible reading if he happens to draw the number 1,000. See Santa Fe, 120 S.Ct. at 2282-83 ("Government efforts to endorse religion cannot evade constitutional reproach based solely on the remote possibility that those attempts may fail”).

. I respectfully suggest that Judge Jolly is simply wrong when he argues that plaintiffs in Establishment Clause cases are required to go further than this by showing that, because of their fear of being subjected to the unconstitutional program, they are presently suffering from deleterious psychological harms. As noted above, the plaintiff in Lee v. Weisman was allowed to challenge a school district's use of graduation prayers four years prior to her scheduled high school graduation. 505 U.S. 577, 584, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992).

. The concurrence by judges constituting a majority of this en banc court that the Does have alleged sufficient actual or threatened injury to confer standing makes it unnecessary to reach the Doe's alternative claim of taxpayer standing. Because on remand the Does must once again demonstrate standing at trial, however, I note that they are likely to have standing as taxpayers to challenge the Program. To demonstrate standing on that basis, the Does need show only that (1) they pay taxes to the relevant government entity— here, the School District, and (2) tax revenues are expended on the disputed practice — here, the Clergy in Schools program. See Doe v. Duncanville Independent School District, 70 F.3d 402, 408 (5th Cir.1995) (citations omitted).